# In the United States Court of Federal Claims

No. 05-981C
(Filed: April 7, 2014)

```
*************************************
K-CON BUILDING SYSTEMS, INC.,       *
                                    *     Cross-Motions for Summary Judgment;
                      Plaintiff,    *     Contract to Design and Build Prefabricated
                                    *     Building; Compulsory Counterclaim;
v.                                  *     Contract Disputes Act of 1978; Excusable
                                    *     Delay; Critical Path; Changes; Suspension
THE UNITED STATES,                  *     of Work
                                    *
                      Defendant.    *
*************************************
```

William A. Scott, Charleston, SC, for plaintiff.

Daniel B. Volk, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Plaintiff K-Con Building Systems, Inc. filed three suits in this court concerning its contracts with the United States Coast Guard ("Coast Guard") for the design and construction of prefabricated metal buildings in Elizabeth City, North Carolina, St. Petersburg, Florida, and Port Huron, Michigan. After the court issued summary judgment rulings in each case and held trial in the Elizabeth City case, the parties engaged in settlement discussions. Those discussions revealed several issues that required resolution prior to any settlement. Accordingly, the parties have filed the relevant motions in all three cases.

In this case, which concerns the building in St. Petersburg, plaintiff moves for partial summary judgment on the issue of liquidated damages, and defendant cross-moves for summary judgment on all of plaintiff's remaining claims. For the reasons set forth below, the court denies both motions.

## I. BACKGROUND

In April 2001, the United States General Services Administration ("GSA") awarded plaintiff a Federal Supply Schedule contract for Prefabricated Structures and Outdoor Smoking

Shelters.[1]  Subsequently, in the summer of 2003, the Coast Guard solicited a proposal from plaintiff for the design and construction of a prefabricated structure to serve as a supply warehouse in St. Petersburg.  The Coast Guard divided the warehouse project into three components:  a base item and two options items.  The base item consisted of the design and construction of the warehouse, and included all site work, utilities, and parking.  The option items concerned the construction of additional facilities within the warehouse.  The Coast Guard awarded the contract to plaintiff on September 5, 2003, but due to funding issues, only the base item was awarded.  Along with other standard clauses, the contract contained clauses pertaining to changes, differing site conditions, suspension of work, and liquidated damages.  Of particular interest in this case is the liquidated damages clause that provided for liquidated damages in the amount of $564 for each day that plaintiff failed to complete the building beyond the contractually specified completion date, which, on the date of contract award, was July 26, 2004.

## A.  Contract Performance

### 1.  Design Submissions

The contract award triggered deadlines related to construction bonds, project schedules, project meetings, the commencement of work, and the initial design submission.  On October 15, 2003, after approving plaintiff's bonds, the Coast Guard permitted plaintiff to begin work at the job site.  Shortly thereafter, on November 4, 2003, the Coast Guard conducted a delayed postaward kickoff meeting with plaintiff.  During the meeting, the participants discussed a variety of issues related to the design documents that plaintiff would provide to the Coast Guard.  In addition, plaintiff informed the Coast Guard that its geotechnical firm had begun its site investigation, and that it had hired both an architect and a firm to produce the site work and civil work designs.

Pursuant to the contract specifications, plaintiff was required to present to the Coast Guard a schedule that reflected plaintiff's submission of the design in three phases (a "50% design," a "100% design," and a "final design").  In the schedule it submitted to the Coast Guard on November 7, 2003, plaintiff indicated that it had begun working, to an unspecified extent, on the 50% design on October 16, 2003–the day it likely received the Coast Guard's notice to proceed–and planned to submit it to the Coast Guard around November 14, 2003.  In that same schedule, plaintiff indicated that it anticipated beginning construction on December 29, 2003,

---

[1]  The court derives many of the facts in this section from its November 30, 2012 Opinion and Order, K-Con Bldg. Sys., Inc. v. United States, 107 Fed. Cl. 571 (2012).  The balance of the facts are derived from the appendices filed in conjunction with defendant's current motion for summary judgment ("Pl.'s 2nd App." and "Def.'s 2nd App.") and the appendices filed in conjunction with the parties' briefing on the original motions for summary judgment ("Pl.'s App.," "Pl.'s Supp'l App.," and "Def.'s Supp'l App."); citations to those documents are set out in footnotes.  Only the facts relevant to the parties' present motions are included.

erecting the building beginning on March 22, 2004, and completing the project around May 27, 2004–two months before the contract completion date.

Plaintiff did not meet its self-imposed November 14, 2003 deadline for submitting the 50% design to the Coast Guard.  Instead, it appears that plaintiff submitted the 50% design shortly after December 10, 2003.  In a January 6, 2004 letter, the Coast Guard noted several issues with the design that required plaintiff's attention before it could conduct its official review.  These issues included electronic files that did not comply with computer-aided-design requirements, incomplete drawing sets, systems missing from the drawings, and missing calculations for the foundation design.  To address the Coast Guard's comments, plaintiff was required to have its designer redesign the foundation, which entailed making new calculations and amending its drawings.

Plaintiff resubmitted a complete 50% design on February 2, 2004, and its foundation calculations on February 3, 2004.  The Coast Guard approved the design three days later.  Plaintiff then submitted its 100% design on February 25, 2004.  In a cover letter to its review comments, the Coast Guard noted that it "consider[ed] the design, especially the Structural design, incomplete" and requested that plaintiff make corrections.

## 2.  Construction Begins

Pursuant to the contract specifications, plaintiff could not begin construction until the Coast Guard approved the final design.  That approval occurred some time before April 6, 2004, when plaintiff and the Coast Guard conducted a preconstruction conference.  Plaintiff ultimately began mobilizing for construction on May 1, 2004, with actual construction beginning during the week of May 10, 2004.

Upon the commencement of construction, plaintiff began work on the building's foundation.  According to an as-built schedule included with defendant's expert's report, plaintiff performed its initial work on the foundation from May 13 to May 24, 2004; poured the footings from May 24 to June 1, 2004; poured the walls from June 1 to June 11, 2004; and completed the foundation from June 11 to June 26, 2004.[2]  The progression of work reflected in this as-built schedule was a departure from what plaintiff had initially planned when it began construction.  As early as May 13, 2004, plaintiff had anticipated completing the foundation by June 1, 2004, the date that it had scheduled an order for concrete to arrive on the job site.[3]

---

[2]  See Pl.'s App. 444.  The record does not contain the documents from which defendant's expert took these dates, such as an updated progress schedule or daily construction reports.  However, defendant's expert cites some supporting documents in several footnotes in the body of his report.  See id. at 434-35.

[3]  See Def.'s 2nd App. 1.

During a June 15, 2004 progress meeting, plaintiff and the Coast Guard discussed several issues related to constructing the foundation, pouring the slab, and erecting the building.[4]  One issue discussed was plaintiff's late start on construction.  Because of this late start, the Coast Guard considered most remaining items on the project schedule as being on the critical path of performance.  Then, with respect to the foundation and slab, the Coast Guard expressed its concern that plaintiff was "not following proper construction practices at the jobsite especially regarding the building slab and foundation," noting that its "[i]nspector had to reject two concrete trucks last Friday (6/11/04) as they sat around the jobsite over two hours because [plaintiff] was not ready to use the concrete in the trucks."

In addition, the Coast Guard addressed plaintiff's plan to alter its sequence of construction.  Initially, as reflected on the structural drawing included with its final design, plaintiff planned to erect the building on the foundation after pouring the slab.  But, due to a concrete shortage arising from the large amount of construction occurring in central Florida, plaintiff sought to reverse the sequence and pour the slab after erecting the building.  Plaintiff indicated that many contractors in the area were being forced "to implement [nontraditional] construction sequences" due to the concrete shortage.  Indeed, the Coast Guard acknowledged the effect the concrete shortage would have on the project, remarking that the project might not be completed by the July 26, 2004 contract completion date because the lead time for getting concrete on site was three weeks, and no loads could be placed on the poured concrete until it set, which typically took seven days or longer.  Nevertheless, it concluded that the building could not be erected without the slab in place, and therefore advised plaintiff that it was required to pour the slab before erecting the building.

Further complicating matters, the Coast Guard also informed plaintiff during the progress meeting that there was no space available on the job site to store the building before plaintiff was ready to erect it, and that plaintiff would have one week in which to store and erect the building once it arrived on site.  Plaintiff had originally scheduled three weeks for this process.

Two days after the progress meeting, on June 17, 2004, plaintiff requested by letter an extension of the contract completion date to August 26, 2004, to accommodate the concrete shortage, explaining that it could not obtain the quantity of concrete it needed until July 9, 2004.  Plaintiff retracted this request one week later.[5]

The concrete shortage was not the only issue facing plaintiff during this period of time; plaintiff was also encountering unexpected ground water during its work on the job site.  Pursuant to the contract specifications, plaintiff was to assume "[f]or bidding purposes" that the

---

[4]  See Pl.'s App. 264-66.

[5]  See Def.'s 2nd App. 5.

"depth of the groundwater table [was] four feet below grade or deeper."[6]  In a June 18, 2004 letter, plaintiff notified the Coast Guard that it encountered ground water when it attempted to install an underground storm line.  It indicated that it would cost an additional $4,097 to remove the water from the area using stone and a gas-operated pump, a process it called "dewatering," and accordingly requested an increase in the contract price.  The Coast Guard provided two responses to plaintiff's request.  First, Steve Allen, the Coast Guard's project manager, advised plaintiff in a June 18, 2004 electronic-mail message that the water plaintiff encountered was not a differing site condition,[7] explaining (footnote added):

> The geotech report (dated 7/25/03) furnished by the Government as part of the RFP noted that you would experience groundwater at elevation 3 (your report dated 11/10/03 notes "seasonal high groundwater table will be encountered at a depth of three feet below existing site grades").[8]  Can't tell from your photo what elevation you're experiencing ground water, but your company should have allowed for dewatering in your bid if you are digging 3 feet below grade.

Then, in a June 21, 2004 letter, Cathy Broussard, the contracting officer, advised plaintiff that it "should have known" that ground water existed because it was identified in the July 25, 2003 geotechnical report provided to plaintiff as part of the proposal request package.[9]

Despite these two responses from the Coast Guard, plaintiff resubmitted its request for a contract modification on June 22, 2004,[10] explaining:

> The bid documents under Section 1.6 Geotechnical Design, subsection 1.6.3 state "depth of groundwater is four feet below grade or deeper.["]  Utilizing this information we did not anticipate utilizing any dewatering or well pointing system.  Had we done so the bid price would have increased as much as Twenty or Thirty Thousand Dollars.

> The same holds true after our geotech report was completed.

> In the best interest of the government, K Con, Inc. held the request for modification with the knowledge that . . . dewatering the entire site would cost

---

[6]  Pl.'s App. 150.

[7]  See Def.'s 2nd App. 2.

[8]  Neither the July 25, 2003 geotechnical report nor plaintiff's November 10, 2003 report is part of the record before the court.

[9]  Def.'s 2nd App. 3.

[10]  See Pl.'s Supp'l App. 45.

considerably more than dewatering specific areas as per our request.  Hence K Con, Inc saved the government more than Twenty Thousand Dollars using this approach.

In addition to the monetary compensation it previously sought, plaintiff requested a ten-day contract extension.  Mr. Allen responded to plaintiff's request that same day, informing plaintiff via electronic mail that the Coast Guard disagreed with plaintiff's assessment of the situation.[11] He noted that he received the following report from the Coast Guard's on-site inspector:

> The storm pipe and trench from the parking lot side and under the building are basically dry.  On the Air Field side which is the low point elevation wise. [sic]  The site contractor is using a sump pump to keep dry.  There [are] currently no well points (dewatering) being utilized.  In talking with the Superintendent, no well points (dewatering) [are] required nor planned.  In regards to a claim, I concur with your e-mail declining unforeseen site conditions.  Although I have not reviewed the Geotech report, the seasonal [high water] table was identified and the scope of work as illustrated on sheet c102 indicated that the storm pipe work would be below elevation 3'.  In my opinion, a sump pump for a few days should be incidental to the work.  If we had had rain when the footing trenches were open, a sump pump would also have been required to remove water prior to concrete placement.

Mr. Allen stated his agreement that dewatering and well points were unnecessary and, therefore, plaintiff was not incurring additional costs.

Approximately one week later, on July 1, 2004, plaintiff sent the Coast Guard a progress schedule via electronic mail.  As noted in the accompanying message, the schedule reflected a planned completion date of August 26, 2004, which was one month after the contract completion date.  The Coast Guard acknowledged plaintiff's submission and further noted that the new, delayed completion date would result in the assessment of liquidated damages.  Plaintiff responded that it would "not accept responsibility for the delay" because the delay resulted from the Coast Guard's modification of plaintiff's "construction method."  It specifically referred to the request for a contract modification that it had submitted earlier in the day.  In that request, plaintiff sought an additional $5,100 and ten days for the removal of ground water it encountered when installing the storm drainage pipe.  Plaintiff also sought an additional $16,500 and thirty days for not being permitted to erect the building before pouring the slab, not being permitted to store and erect the building over the course of three weeks, and its inability to schedule concrete with any certainty due to the concrete shortage.  Thus, in total, plaintiff sought an additional $24,100 and forty days for performing work under the contract.

---

[11]  See Pl.'s Supp'l App. 44.

As noted previously, plaintiff had informed the Coast Guard on June 19, 2004, that it had scheduled a delivery of concrete for July 9, 2004.  However, on July 6, 2004, the Coast Guard informed plaintiff that it could not proceed with pouring the slab because the "workmanship and quality of the footings, concrete work, [and] anchor bolts" were unacceptable.  Later that day, Luther Ramsey, plaintiff's project manager, responded:[12]

> This concrete was in place and visible the day we held an on site progress meeting (June 15) attended by Mr. Allen, [the Coast Guard's inspector, and plaintiff].  I was aware of the finish appearance and planned to do cosmetic work when the next pour was scheduled.  It is not reasonable to notify us three weeks later and 48 hours prior to a scheduled critical task that the work is unacceptable.  I have a pour scheduled for Friday at 5 AM.  I am exploring all the options and ramifications of this notice.  I will correspond my findings tomorrow as soon as I have the engineer['s] response.  If I have to cancel the pour due to this issue [plaintiff] will be requesting a time extension due to same.

Indeed, in a November 2013 affidavit, Mr. Ramsey reiterated that the "alleged defective work" noted by the Coast Guard "could be corrected or completed as the work progressed, was insignificant, and did not require resubmittal and approval of any drawings."[13]

Communications between plaintiff and the Coast Guard regarding the concrete work continued.  On July 8, 2004, the Coast Guard advised plaintiff that it would not authorize any concrete pours until it had "received and approved" plaintiff's "deviations for the slab and concrete work."[14]  That same day, plaintiff responded that the Coast Guard's "late review of the construction" made it "impossible to pour the slab on July 9," indicated that it had rescheduled the pour for July 16, 2004, "the next available day," and advised that it would be requesting a fourteen-day contract extension as a result of the delay.[15]  Between July 9 and July 16, 2004, plaintiff's concrete subcontractor repaired hairpins and columns, drilled holes, cut rebar for control joints, and replaced expansion joints on columns.[16]  Ultimately, the Coast Guard authorized the pouring of the slab on July 15, 2004.

---

[12]  Pl.'s Supp'l App. 50.

[13]  Pl.'s 2nd App. 103.

[14]  Def.'s 2nd App. 10.

[15]  Pl.'s Supp'l App. 13.

[16]  See Def.'s Supp'l App. 17-28.

On July 26, 2004, plaintiff submitted to the Coast Guard another request to modify the contract, seeking an additional seventy-one days and $34,300.[17]  Plaintiff broke down this request into several components.  First, it sought additional time and compensation for the delays that were the subject of its July 1, 2004 modification request:  it sought thirty days and $19,000 related to the sequence of construction, the storage of the building, and the concrete shortage; and ten days and $5,100 related to the removal of ground water.  Second, it requested an additional twelve days and $8,000 related to the commencement of construction, explaining (footnote added):

> K-Con is a Design/Build firm in which construction starts after the 35% design approval.  This duration was originally proposed and budgeted but K-Con was unable to start construction until 100% design approval was made.[18]  This is not the proposed Design/Build method nor was it budgeted.  This delay[] occurred between 16 October 2003 and 05 February 2004.

Third, it sought an additional fourteen days for the concrete placement delay, explaining that it was forced to reschedule the concrete placement because the Coast Guard's inspector, who was "aware of the first concrete placement on 15 June 2004[,] did not notify [it] until three weeks later and 48 hours prior to a known scheduled critical task that the work was unacceptable."  Finally, it requested an additional five days and $2,200 for encountering previously unknown conditions during the excavation of utilities.

The Coast Guard denied all but plaintiff's last request in a July 28, 2004 letter signed by Ms. Broussard.[19]  With respect to the Coast Guard's refusal to allow plaintiff to erect the building before pouring the slab, Ms. Broussard noted that plaintiff's proposal was a deviation from the approved drawings.  Thus, she indicated, to change the order of construction, plaintiff should have revised the drawings, obtained approval from its designer of record, and submitted the designer's approval to the Coast Guard.  Next, concerning plaintiff's removal of ground water, Ms. Broussard indicated that the Coast Guard's position had not changed because the July 25, 2003 geotechnical report indicated that "water could be expected at approximately -4 feet below grade."  Then, addressing plaintiff's contentions regarding it being unable to begin construction before a 100% design was approved, Ms. Broussard remarked that the prerequisites for commencing construction were clearly set forth in the contract specifications, explaining (footnote added):

---

[17]  See Pl.'s Supp'l App. 33-35.

[18]  Although plaintiff refers to a "100% design approval," the contract specifications indicated that construction could not begin until the final design was approved.

[19]  See Pl.'s Supp'l App. 54-55.

> [The contract specifications] clearly identified submittals, their review processes, and the requirement that construction could not begin until the final design had been reviewed and approved. Your proposal was . . . based on these contract requirements. In addition, our telephone conference of 21 August 2003 . . . discussed [sic] various aspects of the contract requirements including design submittals. My records do not indicate any specific concerns with our submittal requirements. A follow-up letter dated 29 August 2003 . . . did not list submittals as one of the exceptions to the proposal.[20]

With respect to plaintiff's inability to pour the slab on July 9, 2004, Ms. Broussard noted that the Coast Guard expressed concern about the quality of the foundation during the June 15, 2004 site visit and that two concrete trucks were rejected on June 11, 2004, because they sat too long waiting for plaintiff to be ready for the pour. Finally, Ms. Broussard requested additional information regarding the previously unknown water pipes plaintiff encountered during utility excavation.

Plaintiff, in turn, responded to the Coast Guard in an August 9, 2004 letter.[21] Of particular note, it addressed Ms. Broussard's comments regarding its inability to commence construction during the design process:

> [The Coast Guard] states that our proposal was based upon the contract requirements when in fact the opposite is true. Our proposal was in lieu of the unreasonable and costly specifications that would result in a price nearest to the next bidder. Additionally we have no record of a telephone conference . . . on 21 August 2003. Therefore our request for 12 additional days and $8,000.00 in extended overhead for design still remains.

Plaintiff also provided Ms. Broussard with the following "'new' information" regarding its dewatering claim: "To meet the negotiated pricing K-Con did not include continuous de-watering of the entire site. Understanding [the Coast Guard] would recognize a tremendous savings in de-watering only when conditions required it. [sic]" In addition, plaintiff provided information related to the unexpected water pipes it encountered during construction.

Ms. Broussard responded to this latest letter from plaintiff on August 11, 2004.[22] With respect to the proposal-versus-contract issue, she wrote:

---

[20] The August 29, 2003 letter is not in the record before the court.

[21] See Pl.'s Supp'l App. 56-57.

[22] See Pl.'s Supp'l App. 98-99.

Your letter of 15 August 2003 . . . outlined your proposal and highlighted the exceptions to the contract document. Receipt of this document triggered our telephone conference call . . . on 21 August 2003. As stated previously, this conversation reviewed [sic] the specification requirements and K-Con's assumptions in the proposal. We specifically discussed topographic, permitting requirements, paving, grading, and your desire to use concrete in lieu of asphalt. We also discussed the silt fence, telecommunication, GF Cable, Sheet A101 plumbing and sanitary lines, sprinkler system requirements and . . . design submittals. Your . . . letter dated 29 August 2003 . . . specifically states "The work performed and price herein will be in accordance with the drawings and specifications provide[d] by [the Coast Guard], with the exception of those items excluded and/or clarified below:" Three exceptions were listed: Asphalt, Fiber Optic Cable and Plumbing Stub-ups. As stated in my letter of 28 July 2004, [the contract specifications] clearly identified submittals, their review processes, and the requirement that construction could not begin until the final design had been reviewed and approved. Your proposal should have been based on these contract requirements.

Ms. Broussard also addressed plaintiff's "new" information concerning its dewatering claim:

As previously stated in my letter[s] of 21 June 2004 and 28 July 2004, you were given a copy of the Geotech report dated 25 July 2003 in your Request for Proposal package. It specifically stated water could be expected at approximately -4 feet below grade. Since you have not provided any new information, our position remains unchanged.

Finally, Ms. Broussard granted plaintiff's request for additional compensation related to the unexpected water pipes. The parties executed a contract modification on August 23, 2004, increasing the contract price by $4,500 (to a total of $539,430), but leaving the contract completion date unchanged.

While plaintiff was pursuing its contract modification requests with the Coast Guard, work was continuing on the job site. The building was delivered on July 14, 2004, and plaintiff began to erect the building on August 9, 2004.

### 3. Hurricane Season

Unfortunately for both plaintiff and the Coast Guard, construction was hindered by four hurricanes that affected central Florida during the summer of 2004. The first hurricane–Hurricane Charley–affected the job site in August 2004. The parties executed a contract modification on August 18, 2004, extending the contract completion date by fifteen days–to August 10, 2004–for "unusually high rainfall during the month of July and Hurricane Charley" and releasing the government from "from any and all liability under the contract for

further equitable adjustments attributable to such facts [or] circumstances giving rise to the proposal for adjustment . . . ."

As of September 1, 2004, plaintiff anticipated completing the project by September 17, 2004.  However, plaintiff's plans were stymied by two additional hurricanes–Frances and Ivan.  According to Mr. Allen (footnote added):[23]

> From 9/01/04 to 9/20/04 (counting weekends), Kcon weathered two Hurricanes (Frances and Ivan).  Frances (on 9/5) had mandatory evacuation of [the] St Pete area on 9/2 and 9/3 plus[] all Labor Day weekend had rain (5 days total).[24]  Hurricane Ivan struck the panhandle of Florida on 9/15, but did not impact the St Pete area, although prior to Ivan's potential arrival the site had to be readied if Ivan struck.  During the remaining period, 2 days of rain occurred over the September average of 0.25" [per] day.

This narrative is consistent with plaintiff's daily construction reports, which reflect that work was not being performed due to Hurricane Frances; that Hurricane Frances caused "minor flooding in trenches" on the job site; that work was affected by Hurricane Ivan; and that it rained during portions of September 8, September 9, and September 16, 2004.[25]  On September 21, 2004, the parties executed a contract modification, extending the contract completion date by sixteen days–to August 27, 2004–for "unusually high rainfall during the month of August and Hurricane[]s Frances and Ivan" and releasing the government from "from any and all liability under the contract for further equitable adjustments attributable to such facts [or] circumstances giving rise to the proposal for adjustment . . . ."

In addition to documenting the effects of Hurricanes Frances and Ivan, plaintiff's daily construction reports for September 2004 reflected the difficulties plaintiff was experiencing with excessive ground water at the job site.[26]  On September 20, 2004, plaintiff noted:  "During the digging for the trench box, we had to dig past the footer and encountered a great deal of water which created problems and began undermining the footers under the building foundation."  The following day, plaintiff further reported:

> [W]e have been working on the trench drain for 5 days.  There was a problem with excessive water and while digging the hole for the trench drain box, it was

--------

[23]  Pl.'s App. 301.

[24]  In 2004, Labor Day weekend spanned from Saturday, September 4 through Monday, September 6.

[25]  See Def.'s Supp'l App. 99-100, 102, 104-06, 108, 119.

[26]  See Def.'s Supp'l App. 105-06, 108, 119, 124, 126.

undermining the footers on the foundation of the building, so we used sheet piling to prevent the undermining, put rock on the bottom of the trench drain, and used a pump in a bucket to keep the water draining out.

On September 22, 2004, as a result of these difficulties, plaintiff submitted to the Coast Guard another request for a contract modification for dewatering,[27] seeking $3,800 and a seven-day contract extension and explaining:

> During the course of installing the trench drain sump K Con, Inc encountered ground water.  In order to complete this task K Con, Inc notified the government of the problem via daily reports, and then proceeded with a dewatering and shoring process in order to maintain a scheduled concrete delivery.  The task was critical to our overall construction schedule.  This condition is due to excessive rain in the area which has caused the water table to rise.

The Coast Guard denied plaintiff's request on September 27, 2004,[28] stating (all errors in the original):

> 2.  The Geotech reports in your contract indicated groundwater could be expected at -4' below grade.  You have not provided documentation that indicates they were encountering groundwater above -4' below grade.

> 3.  Your designer of record's C202 drawing detail ("Grate Inlet & Sump Pump Detail").  The existing grade to match is at 7', detail C202 indicates that the sump trench finished grade at 3.83' or (based on finished grade at 7') it is -3.17' below grade or only a few inches above the -4' elevation that groundwater is expected to be encountered.  Some water will seep or appear into the bottom of the trench.  You should have expected some water removal when trenching so close to the expected groundwater elevation.

> 4.  Dewatering normally requires digging a hole (well points) in the ground, put a barrel or similar with holes in it, near the trench, allow water to accumulate in the barrel, then a pump is used to remove the water from the barrel and the water is discharged far away via piping.  Providing a pump to remove a small amount of water in a trench due to rain from stopping concrete pours or men working is a normal practice in Florida due to the rainy conditions encountered there.

---

[27] See Pl.'s Supp'l App. 101.

[28] See Pl.'s Supp'l App. 104.

5.  Our inspector reports show a "3" pump on site and used for 1 day.  No dewatering well points installed."  As per your design drawings C103, note 2 that reads:

> "Although no dewatering activities are anticipated, all dewatering shall be directed to a temporary pond area, adequately sized to contain the dewatering flow with minimum discharge directed to the area of natural discharge.  The temporary dewatering pond shall be surrounded by properly installed siltation screen with double siltation screen located at the temporary dewatering pond discharge area."

A fourth hurricane–Hurricane Jeanne–affected work on the job site in late September 2004, but the record before the court lacks any evidence that plaintiff sought any compensation from the Coast Guard related to it.

### 4.  Completion of the Building

On November 4, 2004, Mr. Allen scheduled a final inspection of the project for November 10, 2004.  Another inspection occurred on December 1, 2004, at which time the Coast Guard accepted beneficial occupancy of the building.

On February 3, 2005, the Coast Guard assessed liquidated damages against plaintiff by unilaterally amending the contract to reduce the contract price.  Before that date, the contract completion date had been extended, for reasons unrelated to the issues in the present motions, from August 27, 2004, to September 2, 2004.  Based on its December 1, 2004 acceptance of the building, the Coast Guard assessed ninety days of liquidated damages, which, at $564 per day, totaled $50,760.  It therefore reduced the contract price to $488,670, depriving plaintiff of the $52,260 that it would have been paid had the Coast Guard not assessed liquidated damages.

### B.  Procedural History

Plaintiff submitted a claim to Ms. Broussard on July 28, 2005, seeking the payment of $51,260 that it alleges was wrongfully withheld by the Coast Guard as liquidated damages, plus interest.  Specifically, plaintiff contended:

> The assessment of liquidated damages is not appropriate because [it] was not the sole cause of any alleged delays, any alleged delays by [it were] concurrent with delays caused by the government, the government failed to issue extensions to the completion date as a result of changes to the contract by the government, and the liquidated damages are an impermissible penalty.

It requested a final decision on its claim, but also noted that "the assessment of liquidated damages is a claim by the government."  Ms. Broussard issued her decision on plaintiff's claim on August 22, 2005.  After acknowledging plaintiff's request for the remission of liquidated

damages and noting that plaintiff had not completed work by the September 2, 2004 contract completion date, Ms. Broussard determined that plaintiff had not provided any information demonstrating why it was "not responsible for the delay," and that the Coast Guard was "not aware of any event or occurrence that would excuse [plaintiff's] late performance." She therefore denied the claim.

Less than one month later, plaintiff filed a complaint in the United States Court of Federal Claims ("Court of Federal Claims") challenging Ms. Broussard's decision. It alleged that during contract performance, "the Coast Guard changed and modified the contract in[,] among other ways, by failing to properly review and approve drawings [it] submitted . . . , and by directing [it] to perform additional work that was not required by the Contract." It also alleged that "[t]he Coast Guard failed to extend the Contract as a result of its actions, or inactions, and as required by the Contract because of the changes to the work directed by the Coast Guard." For these reasons, plaintiff sought the remission of $50,760 in liquidated damages retained by the Coast Guard.

On December 15, 2006, plaintiff submitted a second claim to Ms. Broussard, seeking payment of $34,300 and an eighty-eight-day contract extension for additional work performed at the Coast Guard's direction, indicating that its claim was based on the contentions set forth in its July 26, 2004 letter and other, unidentified "correspondence during the contract." In her January 16, 2007 letter denying plaintiff's claims, Ms. Broussard addressed each contention set forth in plaintiff's July 26, 2004 letter, but did not address any contentions that may have been set forth in other correspondence. Shortly thereafter, plaintiff filed an unopposed motion to amend its complaint to add the allegations it presented to Ms. Broussard in its December 15, 2006 claim letter. Specifically, plaintiff sought to amend its complaint to assert a claim for a $34,300 increase in the contract price and an eighty-eight-day contract extension, alleging that despite Ms. Broussard's rejection of its claim, it was "entitled to additional compensation and an extension to the contract as a result of changes directed by the Coast Guard." The court granted plaintiff's unopposed motion and plaintiff thereafter filed its amended complaint.

After discovery, plaintiff moved for summary judgment on two issues: whether the contract's liquidated damages rate constituted a penalty and whether it was entitled to the remission of some of the retained liquidated damages due to excusable delays. On the latter issue, plaintiff argued that it was entitled to the remission of sixty-seven days of liquidated damages: thirty-two days for the Coast Guard's delay in convening the postaward kickoff meeting; eleven days for being required to change the design of the building's foundation; and twenty-four days to compensate for the impact of Hurricanes Charley, Frances, Ivan, and Jeanne. Defendant cross-moved for summary judgment on these same issues, contending that the liquidated damages rate was not a penalty and that plaintiff was not entitled to the remission of sixty-seven days of liquidated damages for the reasons plaintiff cited. Defendant also moved for summary judgment with respect to what it referred to as the remaining twenty-three days of liquidated damages that plaintiff sought to recover.

-14-

After reviewing the briefs and evidence submitted in support of the cross-motions for summary judgment, the court invited supplemental briefs from the parties concerning whether, as required by the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. §§ 601-613 (2000),[29] plaintiff had submitted a claim to Ms. Broussard that adequately informed her that it was seeking the remission of liquidated damages as the result of the purported delays described in its motion for partial summary judgment.[30]   Defendant responded to the court's invitation by moving to dismiss the bulk of plaintiff's claims–plaintiff's requests for the remission of liquidated damages, an eighty-eight-day time extension, and a $34,300 increase in the contract price–for lack of jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").[31]

In its November 30, 2012 Opinion and Order, the court first addressed the jurisdictional issues.  It held that it possessed jurisdiction over plaintiff's claim for the remission of liquidated damages because "plaintiff set forth a valid CDA claim for the remission of liquidated damages in its July 28, 2005 claim letter, the basis of which is found in the formal requests for time extensions that it submitted to the contracting officer during contract performance."  K-Con Bldg. Sys., Inc., 107 Fed. Cl. at 571.  In a footnote, the court noted that the record before it included formal requests for time extensions in correspondence dated June 17, 2004; June 22, 2004; July 1, 2004; July 26, 2004; August 16, 2004; September 9, 2004; and September 22, 2004.[32]  Id. at 589 n.15.  The court then concluded that it possessed jurisdiction to consider the monetary claim set forth in plaintiff's December 15, 2006 claim letter.  Id. at 593.  Next, turning to plaintiff's motion for summary judgment, the court concluded that the liquidated damages rate was not an unenforceable penalty, and that for various reasons, plaintiff could not obtain the remission of liquidated damages for the sixty-seven days of delay specified in its motion for partial summary judgment.  Id. at 594-601.  Then, addressing defendant's motion for summary judgment, the court held that plaintiff was "not entitled to the remission of liquidated damages for any delays incurred related to the sequence of construction."  Id. at 604.  Finally, the court explained that plaintiff still had viable claims before the court:  "Remaining viable are plaintiff's

---

[29]  All citations to the CDA are to the version of the statute in effect on the date that the Coast Guard placed its order with plaintiff.  Congress has since recodified title forty-one of the United States Code, revising and renumbering the provisions of the CDA.  See Pub. L. No. 111-350, §§ 7101-7109, 124 Stat. 3677, 3816-26 (2011).

[30]  Defendant had not, prior to the court's request for supplemental briefs, challenged the court's jurisdiction.

[31]  The only claim not subject to defendant's motion was plaintiff's contention that the liquidated damages assessed by the Coast Guard constituted an unenforceable penalty.

[32]  At the time that it issued its November 30, 2012 Opinion and Order, the court was not in possession of any evidence that plaintiff had retracted the request contained in its June 17, 2004 letter.

claim for the remission of liquidated damages for excusable delays not addressed in this Opinion and Order and plaintiff's claim for a $34,300 increase in the contract price." Id. at 605.

As noted above, this is one of three breach-of-contract cases before the court involving plaintiff and the Coast Guard. The court issued a summary judgment ruling in the Elizabeth City case in January 2011, K-Con Bldg. Sys., Inc. v. United States, 97 Fed. Cl. 41 (2011), which was followed by a two-week trial in December 2011. After trial, it was necessary for the court to rule on plaintiff's motion for sanctions. K-Con Bldg. Sys., Inc. v. United States, 106 Fed. Cl. 652 (2011). In addition, the court issued a summary judgment ruling in the Port Huron case in August 2011, K-Con Bldg. Sys., Inc. v. United States, 100 Fed. Cl. 8 (2011). After the court issued its summary judgment ruling in this case, the parties engaged in settlement discussions through the court's alternative dispute resolution program. Those discussions revealed several issues that required resolution prior to any settlement, leading the parties to file the relevant motions in each case. In this case, plaintiff filed a second motion for partial summary judgment limited to the issue of whether defendant was required to file a counterclaim for liquidated damages. Defendant filed a cross-motion for summary judgment, seeking the dismissal of all of plaintiff's remaining claims. The parties have completed briefing on the motions and, finding oral argument unnecessary, the court is prepared to rule.

## II. DISCUSSION

### A. Motions for Summary Judgment

Both parties move for summary judgment pursuant to RCFC 56. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. RCFC 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Celotex Corp., 477 U.S. at 323. The nonmoving party then bears the burden of showing that there are genuine issues of material fact for trial. Id. at 324. Both parties may carry their burden by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1).

The court must view the inferences to be drawn from the underlying facts in the light most favorable to the nonmoving party. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the court must not weigh the evidence or make findings of fact. See Anderson, 477 U.S. at 249 ("[A]t the summary judgment stage the judge's function is not

himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); Contessa Food Prods., Inc. v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) ("On summary judgment, the question is not the 'weight' of the evidence, but instead the presence of a genuine issue of material fact . . . ."), abrogated on other grounds by Egyptian Goddess, Inc. v. Swish, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); Ford Motor Co. v. United States, 157 F.3d 849, 854 (Fed. Cir. 1998) ("Due to the nature of the proceeding, courts do not make findings of fact on summary judgment."); Mansfield v. United States, 71 Fed. Cl. 687, 693 (2006) ("[T]he Court may neither make credibility determinations nor weigh the evidence and seek to determine the truth of the matter.  Further, summary judgment is inappropriate if the factual record is insufficient to allow the Court to determine the salient legal issues.").  Entry of summary judgment is mandated against a party who fails to establish "an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.  However, if neither party meets this burden on the filing of cross-motions for summary judgment, then the court must deny both motions. See, e.g., Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 723 (2009); Dick Pac./GHEMM, JV v. United States, 87 Fed. Cl. 113, 126 (2009).

### B.  Plaintiff's Motion for Partial Summary Judgment

In its motion for partial summary judgment, plaintiff contends that defendant's failure to file a counterclaim asserting its right to liquidated damages requires the court to grant it summary judgment on its claim for the remission of liquidated damages.  Plaintiff is mistaken.

As noted above, the Coast Guard asserted a right to liquidated damages for plaintiff's failure to complete the project by the contract completion date and then assessed liquidated damages against plaintiff by unilaterally modifying the contract to reduce the total contract price. Plaintiff subsequently submitted a claim to the contracting officer seeking the remission of the liquidated damages in the Coast Guard's possession, which the contracting officer denied.  In such circumstances, there is both a government claim against plaintiff for liquidated damages and a claim by plaintiff against the government for the remission of retained liquidated damages. See K-Con Bldg. Sys., Inc., 107 Fed. Cl. at 587-88 (citing Sun Eagle Corp. v. United States, 13 Cl. Ct. 465, 480-82 (1991)).  And, there is both a final decision on the government's claim for liquidated damages, see Placeway Constr. Corp. v. United States, 920 F.2d 903, 906 (Fed. Cir. 1990) (holding that the contracting officer "effectively made a final decision on the government claim" for set off by declining to pay the contractor the balance due on the contract), and a final decision on plaintiff's claim for the remission of liquidated damages.

There is no question that the only way that plaintiff could recover the liquidated damages retained by the Coast Guard was by appealing one or both of the contracting officer's final decisions. See 41 U.S.C. §§ 606, 609.  The Coast Guard, on the other hand, had no reason to pursue its claim for liquidated damages any further because it already possessed all of the liquidated damages to which it asserted entitlement.  It would only have been necessary for defendant to file a counterclaim had the remaining contract balance been less than the total amount of assessed liquidated damages (and had the defendant wished to recover the funds that it

was unable to retain). See, e.g., K-Con Bldg. Sys., Inc., 100 Fed. Cl. at 19 ("Defendant filed a counterclaim . . . seeking the balance of liquidated damages . . . ."); K-Con Bldg. Sys., Inc., 97 Fed. Cl. at 49 (same). Indeed, this was the situation in many of the cases cited by plaintiff in support of its contention that the government must file a counterclaim to recover liquidated damages from a contractor. See Metcalf Constr. Co. v. United States, 102 Fed. Cl. 334, 368-69 (2011) (noting that the government sought, in its counterclaim, liquidated damages in an amount greater than what it retained from the contract price), rev'd, 742 F.3d 984 (Fed. Cir. 2014); M. Maropakis Carpentry, Inc. v. United States, 84 Fed. Cl. 182, 184 (2008) ("These allegations were met with . . . a four-paragraph counterclaim, in the amount of $59,514, representing the unpaid balance of the assessed liquidated damages."), aff'd, 609 F.3d 1323 (Fed. Cir. 2010); Roxco, Ltd. v. United States, 77 Fed. Cl. 138, 140 (2007) (noting that the remaining contract balance was insufficient to cover all of the assessed liquidated damages, and that the government sought in its counterclaim all of the liquidated damages assessed); Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 487 (1993) (explaining that the government sought, in its counterclaim, reprocurement costs and liquidated damages in an amount greater than the remaining contract balance).

That defendant was not required to assert a counterclaim for liquidated damages is entirely consistent with RCFC 13, contrary to plaintiff's contention. RCFC 13 addresses, in part, compulsory counterclaims, and provides:

> A pleading must state as a counterclaim any claim that–at the time of its service–the pleader has against an opposing party if the claim:
>
> > (A) arises out of the transaction or occurrence that is the subject matter of the opposing party's claim; and
> >
> > (B) does not require adding another party over whom the court cannot acquire jurisdiction.

RCFC 13(a)(1) (emphasis added). At the time defendant served its answer, it did not have an outstanding claim against plaintiff; the Coast Guard's claim had already been resolved to its satisfaction, as reflected by its possession of all of the funds to which it claimed entitlement. Therefore, defendant was not required to assert a counterclaim.

Moreover, even if defendant was required to assert a counterclaim for liquidated damages, plaintiff could not obtain the relief it seeks–judgment on its claim for the remission of retained liquidated damages. Rather, the consequence of a defendant's failure to assert a compulsory counterclaim is that the defendant "waive[s] its right to bring the counterclaim and is forever barred from asserting that claim in future litigation." Polymer Indus. Prods. Co. v. Bridgestone/Firestone, Inc., 347 F.3d 935, 938-39 (Fed. Cir. 2003) (citing Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 801-02 (Fed. Cir. 1999)); accord Nasalok Coating Corp. v. Nylok Corp., 522 F.3d 1320, 1324 (Fed. Cir. 2008) (citing Baker v. Gold Seal Liquors, Inc., 417 U.S. 467, 469 n.1 (1974); Restatement (Second) of Judgments § 22(2) (1982)). This consequence to the defendant does not affect a plaintiff's obligation to prove its affirmative

claims.  Accordingly, plaintiff is not entitled to summary judgment on its claim for the remission of retained liquidated damages.

## C. Defendant's Cross-Motion for Summary Judgment

In its cross-motion for summary judgment, defendant addresses all of the claims asserted by plaintiff that it believes remain viable after the court's November 30, 2012 Opinion and Order.  From defendant's point of view, the surviving claims are (1) plaintiff's claim of excusable delay asserted in its July 28, 2005 claim letter and more specifically described in its earlier formal requests for time extensions submitted to the Coast Guard, and (2) plaintiff's request for a $32,100 increase in the contract price asserted in its December 15, 2006 claim letter and premised on its July 26, 2004 letter to the Coast Guard.[33]  More specifically, defendant identifies plaintiff's unresolved time extension requests as:

- an up-to-one-month extension due, in part, to concrete shortages, as set forth in plaintiff's July 1, 2004, and July 26, 2004 letters;

- a ten-day extension due to plaintiff encountering unexpected ground water when installing a storm drainage pipe, as set forth in plaintiff's June 22, 2004, July 1, 2004, and July 26, 2004 letters;

- a twelve-day extension due to plaintiff's inability to proceed with construction before the submission of a 100% design, as set forth in plaintiff's July 26, 2004 letter;

- a fourteen-day extension due to delays related to concrete placement, as set forth in plaintiff's July 26, 2004 letter;[34] and

---

[33]  Plaintiff actually requested a price increase of $34,300; however, $2,200 of its request–the portion related to the unexpected conditions encountered when excavating utilities– was granted in a contract modification.

[34]  Defendant contends that plaintiff's concrete placement claim was part of plaintiff's construction sequence claim, which the court rejected in its November 30, 2012 Opinion and Order.  The court disagrees.  In its construction sequence claim, plaintiff alleged that it could have completed the building earlier than it did had the Coast Guard allowed it to erect the building prior to pouring the slab.  In contrast, in its concrete placement claim, plaintiff contends that it could have completed the building earlier than it did had the Coast Guard not withheld for three weeks its opinion that plaintiff's prior concrete work was unacceptable.  These are two distinct claims, requiring separate proofs.

- a seven-day extension due to plaintiff encountering unexpected ground water when installing the trench drain sump, as set forth in plaintiff's September 22, 2004 letter.

And, defendant avers that plaintiff's request for a contract price increase includes:

- $8,000 for extended overhead related to plaintiff's inability to proceed with construction before the submission of a 100% design;

- up to $19,000 for extended overhead pertaining to the concrete shortage; and

- $5,100 for dewatering during plaintiff's installation of a storm drainage pipe in June 2004.

Based on the record before the court, defendant's characterization of plaintiff's remaining claims is accurate.[35]  The record does not include any formal requests by plaintiff to the contracting officer for time extensions other than those enumerated above.  And, because the only contract price increase sought by plaintiff in its amended complaint is the one it described in its December 15, 2005 claim letter, any other request for a price increase that may be included in the record is not properly before the court.[36]  In sum, in considering defendant's cross-motion for

_____

[35]  Plaintiff's contention that the record contains evidence of a viable claim concerning the thickness of a concrete slab that it was required to remove lacks merit.  While the evidence in the record demonstrates that plaintiff advised the Coast Guard of the issue, Pl.'s Supp'l App. 78-79, and that the excessive slab thickness had "impacted" it, id. at 79, there is no evidence that plaintiff actually requested an increase in the contract price or a time extension to compensate it for the additional work that was required.  In other words, plaintiff never submitted a claim to the contracting officer, as required by the CDA.  See 41 U.S.C. § 605(a); Reflectone, Inc. v. Dalton, 60 F.3d 1572, 1576 (Fed. Cir. 1995) (en banc) (holding that "the [Federal Acquisition Regulation ("FAR")] requires a 'claim' to be a written demand seeking a sum certain . . . as a matter of right").  Such a claim is a jurisdictional prerequisite to pursuing the allegations in the Court of Federal Claims.  England v. Swanson Grp., Inc., 353 F.3d 1375, 1379 (Fed. Cir. 2004).

[36]  For example, while plaintiff's September 22, 2004 request for a $3,800 price increase related to its installation of the trench drain sump appears to qualify as a CDA claim, see 41 U.S.C. § 605(a); Reflectone, Inc., 60 F.3d at 1576, and Ms. Broussard's rejection of that request appears to qualify as a contracting officer's decision, see 41 U.S.C. § 605(a), (c); Alliant Techsys., Inc. v. United States, 178 F.3d 1260, 1268 (Fed. Cir. 1999) ("A letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision."); Placeway Constr. Corp., 920 F.2d at 907 ("The decision is no less final because it failed to include boilerplate language usually present for the protection of the contractor."), plaintiff did not appeal that decision to the court.  A proper appeal is a jurisdictional prerequisite.  See Scott Timber Co. v. United States, 333 F.3d 1358, 1365-66 (Fed. Cir. 2003) (noting that the

summary judgment, the court treats the claims set forth above as plaintiff's sole remaining claims.

### 1. Commencement of Construction

In the first of its remaining claims, plaintiff seeks a twelve-day time extension and $8,000 for being unable to begin construction until the Coast Guard's approval of a 100% design. Defendant articulates several reasons why plaintiff cannot recover for this delay. Two of the reasons are premised on plaintiff's contention, in its July 26, 2008 letter, that it typically is permitted to proceed with construction upon the approval of a 35% design, and that the proposal it submitted to the Coast Guard was consistent with this typical practice. Specifically, defendant contends that plaintiff's project schedules never included the submission of a 35% design and that the contract did not contain a 35% design requirement. As plaintiff asserts, defendant's focus on its reference to a 35% design is misplaced. In its July 26, 2004 letter, plaintiff did not argue that it should have been permitted to submit a 35% design; rather, it contended that it should have been able to begin construction before the Coast Guard approved a 100% design.

This last point bears repeating: the claim that plaintiff presented to Ms. Broussard was that the Coast Guard prevented it from beginning construction prior to the approval of a 100% design. However, plaintiff has refined its claim and now argues, in its response to defendant's cross-motion for summary judgment, that the Coast Guard delayed the design process by not complying with the review procedures and deadlines set forth in the contract specifications. This argument is appreciably different from the claim it presented to Ms. Broussard, and there is no evidence in the record before the court that plaintiff formally requested a contract modification from the Coast Guard based on the Coast Guard's purported noncompliance with the submittal review procedures described in the contract. Because plaintiff's current position was not presented to the Coast Guard, as required under the CDA, the court must disregard it.[37] See Contract Cleaning Maint., Inc. v. United States, 811 F.2d 586, 592 (Fed. Cir. 1987) (holding that

---

contractor's appeal must "arise from the same operative facts" and seek "essentially the same relief" as the claim submitted to the contracting officer, and remarking that this requirement is jurisdictional in nature); James M. Ellett Constr. Co. v. United States, 93 F.3d 1537, 1541 (Fed. Cir. 1996) ("The CDA grants the court jurisdiction over actions brought on claims within twelve months of a contracting officer's final decision.").

[37] Indeed, to the extent that plaintiff is attempting to use a legal memorandum to assert facts not in the record, it cannot be permitted to do so. See Enzo Biochem, Inc. v. Gen-Probe, Inc., 424 F.3d 1276, 1284 (Fed. Cir. 2005) ("Attorney argument is no substitute for evidence."); Mel Williamson, Inc. v. United States, 229 Ct. Cl. 846, 848 (1982) ("Argument is not fact."); Del., Lackawanna & W. R.R. Co. v. United States, 54 Ct. Cl. 35, 41-42 (1919) ("The court can not accept asseverations of counsel, as to facts, made in argument, whether denied or conceded by the other side at the bar, without any stipulation duly filed or other evidence . . . .").

a contractor must provide the contracting officer with "adequate notice of the basis and amount of the claim").

Plaintiff is therefore left with the claim it actually presented in its July 26, 2008 letter. Defendant argues that this claim is not viable because plaintiff failed to notify the Coast Guard of the purported delay in a timely manner.  The court rejects this argument.  The notice requirement contained in the contract's changes and suspension of work clauses, see FAR 52.242-14; FAR 52.243-4, is flexible; and defendant has not demonstrated that it was prejudiced by the timing of plaintiff's notice.  See Hoel-Steffen Constr. Co. v. United States, 456 F.2d 760, 767-68 (Ct. Cl. 1972) ("To adopt [a] severe and narrow application of the notice requirements . . . would be out of tune with the language and purpose of the notice provisions, as well as with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically and illiberally where the Government is quite aware of the operative facts."); Calfon Constr., Inc. v. United States, 18 Cl. Ct. 426, 438-39 (1989) ("If the contracting officials have knowledge of the facts or problems that form the basis of a claim and are able to perform necessary fact-finding and decisionmaking, the Government is not prejudiced by the contractor's failure to submit a precise claim at the time a constructive change occurs." (citing Shepherd v. United States, 113 F. Supp. 648, 653 (Ct. Cl. 1953); G.M. Shupe Inc. v. United States, 5 Cl. Ct. 662, 727 (1984))), aff'd on other grounds, 923 F.2d 872 (Fed. Cir. 1990) (unpublished table decision).  Indeed, the fact that Ms. Broussard responded to the merits of plaintiff's claim is evidence that the Coast Guard was not prejudiced by the timing of plaintiff's notice.

Defendant's sole remaining argument pertains to the critical path of contract performance. To recover for an excusable delay, the alleged cause of the delay "must delay the overall contract completion; i.e., it must affect the critical path of performance."[38]  Sauer Inc. v. Danzig, 224 F.3d

---

[38]  The United States Court of Claims described the critical path concept in the following manner:

> [T]he critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work.  (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.)  The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project.  Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project.  However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed.  These latter items of work are on the "critical path."  A delay, or acceleration, of work along the critical path will affect the entire project.

Haney v. United States, 676 F.2d 584, 595 (Ct. Cl. 1982); accord Wilner v. United States, 24

1340, 1345 (Fed. Cir. 2000).  Defendant contends that plaintiff's claim is not viable because plaintiff's expert concluded that the purported delay was not on the critical path.  Defendant's representation is accurate, but fails to take into account the basis of plaintiff's expert's conclusion.  Plaintiff's expert considered whether the Coast Guard's review of plaintiff's 50% and 100% designs complied with the deadlines provided in the contract specifications and concluded that the documentation to which he had access did not support a compensable delay, but noted that his conclusion could change if further investigation revealed additional facts.  See Pl.'s App. 410-11.  In light of its expert's explanation, plaintiff responds to defendant's argument by citing defendant's expert, who concluded that there were critical delays associated with the submission and review of the 50% and 100% designs submitted by plaintiff.  See id. at 431-33.  However, as noted above, these analyses have no bearing on plaintiff's claim that the Coast Guard prevented it from beginning construction prior to the approval of a 100% design.  Plaintiff's claim does not concern the Coast Guard's purported delays in reviewing and approving its designs; rather, it concerns whether the Coast Guard should have permitted plaintiff to begin construction at an earlier phase in the design process.  According to the evidence in the record, plaintiff premised the claim it presented to Ms. Broussard on the contents of its proposal, which, it contends, was approved by the Coast Guard when Ms. Broussard executed the contract.  See Pl.'s Supp'l App. 56; see also Pl.'s App. 101 ("Your offer . . . including any additions or changes which are set forth herein is accepted as to items.").  However, the court is unable to evaluate plaintiff's claim because plaintiff's proposal is not a part of the record.  And even if it could evaluate the claim without reviewing plaintiff's proposal, the record contains conflicting evidence concerning the proposal's contents.  Compare Pl.'s Supp'l App. 54 ("Your proposal was . . . based on these contract requirements. . . .  My records do not indicate any specific concerns with our submittal requirements.  A follow-up letter . . . did not list submittals as one of the exceptions to the proposal."), with id. at 56 ("[The Coast Guard] states that our proposal was based upon the contract requirements when in fact the opposite is true.  Our proposal was in lieu of the unreasonable and costly specifications . . . .").  Due to the existence of conflicting evidence in the record concerning plaintiff's claim, the court concludes that there exists a genuine issue of material fact as to whether the Coast Guard improperly prevented plaintiff from beginning construction prior to the approval of a 100% design.

### 2. Concrete Shortage and Placement

In addition to seeking a contract modification for its inability to begin construction during the design phase of the project, plaintiff seeks additional time and money for delays associated with the area-wide concrete shortage and its placement of concrete at the job site.  In particular, plaintiff seeks an up-to-one-month time extension and up to $19,000 related to the concrete shortage, and a fourteen-day time extension related to concrete placement.  The facts relevant to these claims are intertwined; plaintiff contends that the Coast Guard delayed advising it about unacceptable concrete work despite being aware that the concrete shortage constrained plaintiff's

---

F.3d 1397, 1399 n.5 (Fed. Cir. 1994) (en banc).

ability to schedule concrete pours on short notice.  Due to the inextricable nature of the claims, the court addresses them together.

Defendant argues that plaintiff cannot recover for any of the purported concrete-related delays because (1) plaintiff was not ready to pour the slab on June 1, 2004, when the concrete was scheduled to arrive on the job site; (2) the Coast Guard, on July 8, 2004, identified problems with the existing concrete work, and therefore prevented plaintiff from proceeding with pouring the slab until the problems were resolved; (3) plaintiff did not reschedule the concrete pour for the slab until July 16, 2004; and (4) there is no evidence that the concrete shortage affected the critical path of performance.  In response, plaintiff asserts that the Coast Guard's failure to advise it regarding the problems with the existing concrete work for three weeks forced it to reschedule the concrete delivery for the slab from July 9, 2004, to July 16, 2004, which, due to the concrete shortage, was the earliest date for which sufficient concrete was available.  Plaintiff further contends that all of the concrete issues were on the critical path, noting that its expert failed to address the concrete shortage only because he addressed a separate, concurrent delay on the critical path, i.e., the purported construction sequence delay.

A review of the record submitted by the parties reveals that there is conflicting evidence regarding whether the Coast Guard delayed plaintiff's completion of the foundation by not identifying its concerns regarding plaintiff's concrete work until three weeks after that work had been in place, even though it was aware of the area-wide concrete shortage.  Thus, there is a genuine issue of material fact for trial.

### 3. Dewatering

Plaintiff's final two remaining claims concern its dewatering activities.  Plaintiff seeks a ten-day time extension and $5,100 for removing the ground water it encountered while installing a storm drainage pipe in June 2004, and a seven-day time extension for removing the ground water it encountered while installing a trench drain sump in September 2004.  Defendant offers several reasons why plaintiff is not entitled to recover on its dewatering claims.  The court addresses these reasons in turn.

First, defendant argues that plaintiff cannot obtain a contract modification under either claim because all of the dewatering performed by plaintiff was foreseeable.  As defendant notes, federal procurement law provides that the government cannot assess liquidated damages against a contractor for a failure to timely complete work under a contract if "[t]he delay in completing the work arises from unforeseeable causes," such as acts of the government, that are "beyond the control and without the fault or negligence of the Contractor."  FAR 52.249-10(b)(1).  In support of its contention that the ground water encountered by plaintiff was a foreseeable condition, defendant relies chiefly on the contents of the Coast Guard's correspondence with plaintiff noting that plaintiff should have been aware of the existence of ground water at a certain depth because it was identified in the July 25, 2003 geotechnical report provided to plaintiff before plaintiff submitted its proposal.  Problematically, however, the correspondence contains conflicting information regarding the precise depth identified in the July 25, 2003 geotechnical report:  some

correspondence cites a depth of three feet, see Def.'s 2nd App. 2, while other correspondence cites a depth of four feet, see Pl.'s Supp'l App. 54, 99, 104; cf. Pl.'s App. 150 (indicating, in the contract specifications, a ground water depth of four feet below grade).  The one-foot difference is important, because it appears that plaintiff's work on the storm drainage pipe may have occurred at depths between three and four feet, and plaintiff's work on the trench drain sump actually occurred at depths between three and four feet.  See Pl.'s Supp'l App. 44 (noting that a drawing included with the contract specifications reflected that work on the storm drainage pipe would occur at a depth of greater than three feet); id. at 104 (noting that plaintiff's drawings reflected that the trench drain sump was installed at a depth between three and four feet).  The court is unable to ascertain the actual depth of ground water identified in the July 25, 2003 geotechnical report because that report is not in the record.  Accordingly, the court cannot conclude that plaintiff encountering ground water at a particular depth was foreseeable.[39]

In a second, related argument, defendant contends that plaintiff cannot recover for dewatering specific areas because it foresaw the need to remove water from the job site from the outset.  Defendant relies upon unspecified documents in the record in support of its contention.  The court's review of the relevant documents in the record–i.e., those pertaining to plaintiff's dewatering claims–reveals that it was plaintiff's position that it had reviewed the documents provided by the Coast Guard in conjunction with the Coast Guard's request for a proposal, ascertained that those documents noted the existence of ground water at a depth of four feet below grade, determined that its work would be performed above that depth, and therefore prepared its proposal with the assumption that dewatering would be unnecessary.  In the absence of citations to documents in the record that contradict this interpretation, the court cannot accept defendant's argument.

Third, defendant contends, with respect to the September 2004 dewatering claim, that plaintiff cannot obtain a time extension because its claim is based on excessive rain, and plaintiff has already been compensated for the unusually high rainfall that occurred in August 2004.  Defendant accurately quotes plaintiff's statement from its September 22, 2004 claim letter that it encountered ground water because excessive rain caused the water table to rise.  However, the court disagrees that the evidence in the record demonstrates that the September 21, 2004 contract modification that extended the contract completion date by sixteen days for "unusually high rainfall during the month of August and Hurricane[]s Frances and Ivan" compensated plaintiff for dewatering.  First, the contract modification, by its express terms, only covered excessive rainfall during the month of August and, indeed, only rainfall that occurred before August 18, 2004, the date the parties executed the contract modification.  Thus, it is possible that the "unusually high rainfall" described in the contract modification is not related to the rising of the

---

[39]  It bears noting that plaintiff's June 2004 dewatering claim may also be cognizable under the contract's differing site conditions clause, FAR 52.236-2, which does not require plaintiff to demonstrate that the differing site condition was foreseeable.  Rather, plaintiff must show that the conditions on the job site differed materially from the conditions described in the contract.  Id.

water table that affected plaintiff's installation of the trench drain sump in mid-September 2004. Second, the contract modification does not expressly indicate that the delays associated with Hurricanes Frances and Ivan were due to "excessive" rain, i.e., rain that caused total rainfall for September to exceed the threshold for compensation. Indeed, the evidence in the record indicates that at least some of the impact of the two hurricanes related to demobilization and mobilization activities. See Pl.'s App. 301; Def.'s Supp'l App. 99-100, 104-05, 112. Based on the evidence in the record, the court cannot conclude that plaintiff released its September 2004 dewatering claim by executing the September 21, 2004 contract modification.

Fourth, defendant notes that neither party's expert placed the September 2004 dewatering claim on the critical path of performance. Plaintiff acknowledges this fact, but asserts that because its expert stated that he did not place the water and sewer work on the critical path due to the existence of other, concurrent, critical delays, the trench drain sump work should be treated as if it were on the critical path. Plaintiff's expert specifically provided:

> The site water and sewer experience[d] approximately two months of delay (67 calendar days) due to existing waterlines, ductbank, hurricanes, rain, and late approvals. The delay was concurrent with the aforementioned delays so no time can be asked for unless the full time for the other issues [is] not granted. . . . This issue can be explored further if other time is not granted.

Pl.'s App. 413. Although it is unclear to the court whether the installation of the trench drain sump was part of the water and sewer work referenced by plaintiff's expert, his statement is sufficient to raise a factual issue regarding whether the dewatering necessary to install the trench drain sump was on the critical path.

Fifth, defendant implies that plaintiff cannot obtain a ten-day extension of time under its June 2004 dewatering claim because its expert only assigned one day of critical delay to the claim. As plaintiff notes, defendant's expert assigned two days of critical delay to this claim. See id. at 434-35. Accordingly, the precise duration of the delay remains in dispute.

Finally, defendant asserts that plaintiff's claim for $5,100 is not supported by plaintiff's job cost ledger. Defendant correctly notes that plaintiff must establish that it incurred the claimed expenses in order to recover them. However, defendant did not submit any evidence in support of its assertion that the job cost ledger did not support plaintiff's claim, whether that evidence consists of the portion of the job cost ledger that should have included the expenses plaintiff incurred for dewatering or an affidavit describing the lack of evidence supporting plaintiff's claim for expenses. See RCFC 56(c)(1) (requiring citation to materials in the record). Defendant's assertion of a fact in a legal memorandum is insufficient to carry its burden under RCFC 56. See Enzo Biochem, Inc., 424 F.3d at 1284; Mel Williamson, Inc., 229 Ct. Cl. at 848; Del., Lackawanna & W. R.R. Co., 54 Ct. Cl. at 41-42.

In sum, the court concludes that there are genuine issues of material fact with respect to both of plaintiff's dewatering claims.

### III.  CONCLUSION

As set forth above, the court **DENIES** plaintiff's motion for partial summary judgment, and **DENIES** defendant's cross-motion for summary judgment.  By **no later than Monday, April 28, 2014**, the parties shall file a joint status report suggesting further proceedings.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney_____
MARGARET M. SWEENEY
Judge